IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEFFREY P. DATTO, Ph.D.        :      CIVIL ACTION
                               :
            v.                 :
                               :
BRIAN HARRISON, et al.         :      NO. 09-2064
_____

JEFFREY P. DATTO, Ph.D.        :      CIVIL ACTION
                               :
            v.                 :
                               :
THOMAS JEFFERSON               :
UNIVERSITY, et al.             :      NO. 09-2549


MEMORANDUM

McLaughlin, J.                        September 9, 2009

        The two above-captioned actions arise from the
dismissal of plaintiff Jeffrey P. Datto, Ph.D. ("Datto") from the
M.D./Ph.D. program of Thomas Jefferson University.  Datto alleges
that his dismissal was the result of disability discrimination or
retaliation or retaliation for his complaints about patient care.
The two suits have a complicated procedural history and both
raise similar claims.  The defendants in each action, who are
represented by common counsel, have filed motions to dismiss.
For reasons explained below, the Court will refer to Case No. 09-
2064 as "Datto III"  and Case No. 09-2549 as "Datto I".

        The motion filed in Datto III seeks to dismiss all
claims.  The motion filed in Datto I seeks to dismiss Counts Four
and Six through Twelve of the operative complaint, which bring
claims under the Americans with Disabilities Act ("ADA"), the

Rehabilitation Act, the Pennsylvania Human Relations Act ("PHRA"), the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), and state law claims for wrongful termination.

For the reasons that follow, the Court will dismiss the plaintiff's ADA and Rehabilitation Act claims in both cases to the extent they concern the defendants' decision to dismiss the plaintiff from the Jefferson M.D./Pd.D. program, but will not dismiss those claims to the extent they concern the defendants' alleged refusal to readmit him to that program.  The Court will also dismiss the plaintiff's Rehabilitation Act claims for retaliation against the individual defendants in both cases, but will not dismiss those claims under the ADA.  The Court will also dismiss the plaintiff's PHRA and PFEOA claims in both cases and the plaintiff's wrongful termination claim in Datto I.

I.   The Procedural History of the Claims

   A.   Datto I

      The plaintiff began the first of these actions, Datto I, by filing a praecipe for a writ of summons, pro se, in the Philadelphia Court of Common Pleas on July 11, 2007.  The plaintiff subsequently filed a complaint and amended it three times in state court.  The plaintiffs' initial complaint and his first two amended complaints brought only state law claims.  The plaintiff's third amended complaint, filed April 21, 2008, after the plaintiff had obtained counsel, for the first time included a

federal claim, alleging a claim under the ADA.  The defendant timely removed Datto I to this Court, where it was docketed as Case No. 08-2154.

The defendants filed a motion in this Court to dismiss Datto I.  The plaintiff opposed the motion and moved to amend the complaint for the fourth time to add another federal claim under the Rehabilitation Act.  While these motions were pending, Datto requested that the case be stayed to allow him to obtain new counsel.  The Court granted the stay, but Datto was unable to obtain new counsel and his current counsel moved to withdraw.

While the defendants' motion to dismiss and the plaintiff's counsel's motion to withdraw were pending, the plaintiff filed a motion asking the Court to "exercise supplemental jurisdiction or in the alternative remand."  In the motion, the plaintiff explained that, after Datto I had been removed to federal court, he had filed two new related suits in state court, Datto II, a medical malpractice action concerning treatment he received while in the Jefferson M.D./Ph.D. program, and Datto III, a substantively identical action to Datto I challenging his dismissal from the M.D./Ph.D. program.  The plaintiff's motion to exercise supplemental jurisdiction or remand sought to have all three actions tried in the same forum and stated that the plaintiff was willing to dismiss his ADA claim in Datto I and have the action remanded to state court where it could be coordinated with Datto II and Datto III.

-3-

The Court granted the plaintiff's motion on March 3, 2009, allowing him to dismiss his federal claim without prejudice, and granted his counsel's motion to withdraw.  The Court declined to exercise pendent jurisdiction over the remaining state law claims and remanded them to state court.  The Court found that the interests of judicial economy and fairness to the parties were best served by having all of the plaintiff's claims brought together in one forum to avoid duplicative litigation.  Although the Court recognized that the plaintiff could seek to amend his complaint to re-assert federal claims in state court after remand, which would allow the defendants to again remove, it reasoned that this possibility, while real, was speculative because the plaintiff had not stated that he intended to seek to re-plead his federal claims and any amendment would require leave of court.

Once the case was remanded, the plaintiff moved in state court to again amend his complaint to add federal claims under the ADA, the Rehabilitation Act and the 14th Amendment to the United States Constitution.  The plaintiff filed the motion to amend on April 22, 2009.  The defendants filed a notice of removal on May 1, 2009, before the motion had been ruled upon.  Upon removal, the case was docketed as Case No. 09-1873.  Because the defendants had removed the case before the plaintiff's motion to amend had been granted, the Court remanded the case <u>sua sponte</u>

-4-

as prematurely removed, finding that, until amended, the operative complaint contained no federal claim allowing removal.

After remand, the defendants did not oppose the plaintiff's motion to amend, and the state court granted the motion on May 11, 2009.  On May 22, 2009, the plaintiff filed his fourth amended complaint containing federal claims under the ADA, the Rehabilitation Act, and the Fourteenth Amendment, and the defendants again filed a notice of removal to this Court, where it has been docketed as Case No. 09-2549.

The operative fourth amended complaint in Datto I names as defendants Thomas Jefferson University ("Jefferson") and eleven individuals who are either Jefferson employees or administrators.[1]  It brings state law claims for breach of contract (Counts I, II, and III); wrongful termination (Count IV); intentional infliction of emotional distress and intentional interference with contract (Count V); violations of the PHRA (Count XI); and violations of the PFEOA (Count XII).  It brings federal claims under the ADA (Counts VI, VII, and VIII), the Rehabilitation Act (Counts IX and X), and the Fourteenth Amendment to the United States Constitution (Count XIII).

---

[1]     The individual defendants in Datto I are Arthur M. Feldman, M.D., Ph.D.; Thomas J. Nasca, M.D.; Mark G. Graham, M.D.; John W. Caruso, M.D.; Charles A. Pohl, M.D.; James A. Fink, M.D.; Nora Sandorfi, M.D.; Thomas Klein, M.D.; Clara Callahan, M.D.; Robert L. Barchi, M.D., Ph.D., Brian Harrison, and four John Doe defendants.

B.   <u>Datto II</u>

The action referred to as Datto II is a state law medical malpractice action pending in the Court of Common Pleas of Philadelphia:  <u>Datto v. Thomas Jefferson University, et al.</u>, Phila. C.C.P., December Term 2007, No. 5181.  According to the state court docket in the case, it was filed on or about January 4, 2008, by writ of summons.  The parties have represented that the case concerns Datto's medical treatment by Thomas Jefferson University and others while enrolled in the M.D./Ph.D. program. Because Datto II brings only state law causes of action, it has not been removed to this Court.

C.   <u>Datto III</u>

Datto III was initiated by a praecipe for writ of summons filed in the Court of Common Pleas of Philadelphia County on October 10, 2008.  On February 2, 2009, defendant Thomas Jefferson University Hospital filed a rule to require the plaintiff to file a complaint, which the plaintiff filed on April 22, 2009.  Like Datto I, the complaint in Datto III challenges the plaintiff's dismissal from Thomas Jefferson University's M.D./Ph.D. program and brings both state and federal claims.  The defendants removed Datto III to this Court on May 13, 2009, where it has been docketed as Case No. 09-2064.

The complaint in Datto III names as defendants Thomas Jefferson University, Thomas Jefferson University Hospitals, Inc.

-6-

("Jefferson Hospital"), and four individuals who are either Jefferson employees or administrators.[2]  It brings claims for violations of the ADA (Counts I, II, and III); the Rehabilitation Act (Count IV and V); the PHRA (Count VI); and the PFEOA (Count VII).

D    Consolidation of Datto I and Datto III

Datto I and Datto III were removed to this Court on May 22 and May 13, 2009, respectively.  After removal, the defendants filed motions to dismiss in both cases, and the plaintiff filed a motion for a preliminary injunction.  At the plaintiff's request, which the defendants did not oppose, the Court consolidated Datto I and Datto III for all purposes and set a briefing schedule on the pending motions.  In the consolidation order, the Court stated that, once the motions were fully briefed, it would review them before scheduling a hearing on the preliminary injunction motion.

Both parties have also moved simultaneously in this Court and in state court to coordinate discovery in Datto I, Datto II, and Datto III.  The parties stipulated to the

---

[2]    The individual defendants in Datto III are Brian Harrison, Thomas Lewis, Thomas Klein, M.D., and Mark Graham, M.D. Five John Doe defendants are also named.  Of these individual defendants, Harrison, Klein and Graham are also named as defendants in Datto I; Lewis is not.

appointment of a discovery matter in all three cases, to be
selected by the Court.

II.   The Allegations of the Complaint

        The operative complaints in Datto I and Datto III
concern the same events, but the allegations in Datto I are far
more detailed.  The Court will set out the allegations of each
complaint separately.

        A.   The Allegations of the Datto I Complaint

        In June of 1996, the plaintiff submitted an application
for the combined M.D./Ph.D. program (the "program") at Jefferson.
The program consisted of two pre-clinical years of medical
school, followed by three or more years of graduate research
leading to a doctoral dissertation.  In choosing to apply to the
program, the plaintiff relied on publications from Jefferson
which described it as giving participants three years to complete
their Ph.D. thesis research.  Datto I Compl. at ¶¶ 19, 22-23, 25.

        In December 1997, the plaintiff was notified that he
had been accepted into the program as an early decision
applicant.  That same month, the plaintiff was told by Jefferson
officials that the university was not likely to be able to offer
him a scholarship because anticipated government funding would
likely not be available.  The plaintiff communicated with
Jefferson officials from January through May 1998 concerning his

expectations of a scholarship and what he alleges was Jefferson's promise to provide one.  Datto I Compl. at ¶¶ 26-30.

On June 2, 1998, Jefferson agreed to fund the plaintiff's entire M.D./Ph.D. education.  Because Jefferson provided funds for the plaintiff, it was unable to fund planned scholarships for other students.  The plaintiff alleges that this caused significant ill will towards him from Jefferson officials. Datto I Compl. at ¶¶ 31-32.

The plaintiff did well academically in his first two years of medical school and in September of 2000 completed the first part of the medical licencing exam in the top 12% of students nationwide.  In September 2001, the plaintiff applied for an National Institute of Health ("NIH") grant with the assistance of Jefferson employees.  The NIH awarded Jefferson and the plaintiff the grant in February 2002 and the plaintiff became the principal investigator.  Datto I Compl. at ¶¶ 33-36.

In spring or summer of 2002, several faculty members, including Dr. Matthew During, the plaintiff's thesis advisor, left Jefferson.  In addition, the Jefferson CNS Gene Therapy Center, in which the plaintiff worked, was shut down.  Although the plaintiff had been working on his research for two years and had not yet written his thesis or had his research published, Dr. Charles Pohl, Dean of Student Affairs, encouraged the plaintiff to return to medical school.  Datto I Compl. at ¶¶ 37-40.

In September 2002, Jefferson sent a letter to the NIH Program Director suggesting that Dr. Irving Shapiro, Director of the Jefferson Cell and Tissue Engineering Program, could become the plaintiff's new "NRSA mentor," replacing Dr. During.  The letter stated that Dr. During would continue to "advise the student scientifically and participate in the preparation" of the plaintiff's thesis and help him publish his researching findings. The letter also said that other members of the plaintiff's committee would work with him to facilitate completion of his thesis research and in the construction of his dissertation. Datto I Compl. at ¶ 41; Ex. E.

The plaintiff returned to medical school and obtained good to excellent grades.  At this time, the plaintiff was also working to complete his thesis, which limited the time he could devote to his medical school studies.  In completing his thesis, the plaintiff did not receive the promised help from his former thesis advisor, Dr. During, or from members of his committee. Datto I Compl. at ¶¶ 42-44.

In January 2004, the plaintiff defended his Ph.D. thesis.  The plaintiff's thesis committee expressed concerns that his thesis needed significant work to ensure publication.  A month before his thesis defense, knowing the thesis still needed significant work, the plaintiff had asked Jefferson for a third year of graduate support to allow him to complete it.  After his defense, the plaintiff approached Dr. Pohl, Dean of Student

-10-

Affairs, to express concerns about his workload and to again request funding for a third year of graduate studies.  Jefferson denied the plaintiff's request for a third year of funding. Datto I Compl. at ¶¶ 46-49.

Jefferson's refusal to fund his third year of studies and his workload from simultaneously completing both his medical school studies and his Ph.D. thesis, put the plaintiff under a great deal of stress.  The plaintiff began seeing Dr. James Youakim, the Jefferson psychiatrist assigned to treat medical students, who prescribed the plaintiff several psychiatric medications including Lithium and Zyprexa.  While on the medication prescribed by Dr. Youakim, the plaintiff experienced significant side-effects, including a severe tremor, neurologic side effects, weight gain, memory loss, slowness of thought, apathy, and cognitive dysfunction.  Datto I Compl. at ¶¶ 50-52.

In April 2004, the plaintiff was given a grade of "Marginal Competence" from Dr. Mark Graham in one of his courses. At this time, Dr. Graham expressed concern that the plaintiff was exhibiting memory problems and visible shaking that Dr. Graham attributed to anxiety.  Dr. Graham did not review his grade with the plaintiff, as required by the Jefferson student handbook, and did not question him about the cause of his shaking.  Datto I Compl. at ¶¶ 54-56.

In May 2004, the plaintiff was placed on a mandatory leave of absence.  The plaintiff met with the Jefferson Committee

-11-

on Student Promotions and told them that his shaking and tremors had been caused by the side-effects of his medication.  The plaintiff did not tell the Committee that his cognitive problems were being caused by his medications, because he had been told by his psychiatrist, Dr. Youakim, that these problems were caused by bipolar disorder and attention deficit hyperactivity disorder. The plaintiff requested that the Committee remove references to his anxiety from his "Dean's Letter" concerning his mandatory leave, but the Committee and Dr. Pohl, Dean of Student Affairs, refused.  Datto I Compl. at ¶¶ 57-63.

After the mandatory leave ended, the plaintiff returned to medical school.  In April 2005, during the plaintiff's penultimate rotation of the year, in rheumatology, the plaintiff took a history from a patient who had been wrongly given an injection of the anti-nausea medication Phenergen inter-arterially instead of intravenously.  The improper injection caused the patient great pain, cyanosis, and shriveling and eventual amputation of the injected limb.  The plaintiff noted the error in the patient's chart and was reprimanded by the plaintiff's rotation supervisor, Dr. Sandorfi, who attempted to remove the notes and indicated that he should not report such incidents.  Datto I Compl. at ¶¶ 64-69.

The plaintiff then went to the Jefferson Ethics Committee and voiced concerns about the incident.  Dr. Sandorfi and others told the Ethics Committee that they had informed the

-12-

patient of the medical error that led to her amputation.  The
plaintiff learned from other students that Dr. Sandorfi was very
angry at him for making a report to the Ethics Committee.  The
plaintiff alleges that he later learned that he was the only
doctor to inform the patient that her amputation was caused by a
medical error, and that other doctors had told the patient that
the plaintiff was "crazy" and that the cause of her amputation
was her diabetes.  The plaintiff also learned that the patient
was not told she might need a second amputation, which was a
possible complication of her condition.  Datto I Compl. at ¶¶ 70-
73.

        After this incident, which occurred in the plaintiff's
penultimate rotation, the plaintiff received a failing grade in
his next rotation.  This was the plaintiff's last rotation before
his graduation.  The plaintiff was given a grade of marginal
competence by the attending and resident on the rotation, but
this was changed to a failing grade by Dr. Arthur Feldman, the
Chairman of Medicine.  The plaintiff alleges that Dr. Feldman had
been tasked by the Ethics Committee with contacting the
improperly-injected patient about whom the plaintiff had
complained and that Dr. Feldman was unhappy about this.  Datto I
Compl. at ¶¶ 76-77, 85-87.

        The plaintiff alleges that the supervisors on this
rotation did not fulfill the responsibilities set out in the
rotation's course description.  The resident on the rotation did

not review each patient's history with the plaintiff or provide
face-to-face feedback and the attending physician did not provide
the plaintiff with "remediation or assistance," as they were
required to do in the course description.  The plaintiff alleges
that, had they done so, the attending and the resident could have
worked with his psychiatrist to identify and correct his
deficiencies, which he contends were caused by his medications.
Datto I Compl. at ¶¶ 78-84.

        Because the plaintiff failed a rotation, he was
dismissed from Jefferson's M.D./Ph.D. program.  Although the
complaint does not specifically allege the date of the
plaintiff's dismissal, the plaintiff has attached to his
complaint a letter to him from Jefferson, dated May 31, 2005,
informing him of his dismissal.  The letter states that the
Jefferson Committee on Student Promotion had reviewed his failing
grade and was "sorry to inform you that the Committee has decided
that your status at Jefferson Medical College has been officially
terminated."  It states he is being "given an Academic Dismissal
based on a consistent inability to achieve a satisfactory
academic record."  The letter also informs the plaintiff that he
has the right to appeal this decision.  Compl. Ex. FF.

        The plaintiff filed an appeal from his dismissal.
During his appeal, the plaintiff says he protested his dismissal,
"raised violations" of the ADA, and "demanded" accommodations.
The plaintiff states that he was told by Dr. Bernard Lopez,

-14-

Assistant Dean of Student Affairs and Career Counseling, that during the appeals process, Jefferson still considered him to be a student.[3]  Datto I Compl. at ¶¶ 92, 94-96.

In a letter dated July 20, 2005, and attached to the plaintiff's complaint, Dr. Lopez formally informed the plaintiff of the result of his appeal.  The July 20, 2005, letter begins by stating that the plaintiff's "dismissal from Jefferson was not rescinded during the entire appeal process" and that "[y]our status remains that you are dismissed."  It states that the Committee on Student Promotions has determined that "the dismissal would be reconsidered if the following 3 conditions are met."  These conditions are:

1.   That the plaintiff have an independent psychiatric evaluation that finds him to be "medically and psychiatrically stable to resume" his medical studies;

2.   That he enter in to a contract with the "Physicians Health Program" and submit a copy of the contract to the Committee; and

---

[3]   The plaintiff has attached to his brief in opposition to the motion to dismiss several emails that the plaintiff received from Dr. Lopez while his appeal was pending.  In these emails, Dr. Lopez describes the decision to be made on appeal as whether to "maintain his dismissal" and, in an email sent after his appeal was determined, tells the plaintiff that Jefferson considered him to be a student during the pendency of his appeal. Pl. Br. at Ex. C.

3)      That he agree to have his dean's letter modified
        to include his diagnosis of bipolar disorder and
        the accommodations that he requested to keep it
        under control.

The letter states that, if he meets these three conditions, "the
Committee will rescind your dismissal and will prepare a
remediation plan" for him to follow.  Datto I Compl. at Ex. I.[4]

        The plaintiff received a second letter setting forth
these conditions, although phrasing them slightly differently, on
July 21, 2005, from the Chairman of the Committee on Student
Promotion.  This letter stated that upon "completion of these
requirements, the Committee will then reconsider its previous
decision of Academic Dismissal."  The plaintiff requested a
clarification of this wording in an email to Dr. Lopez on July
27, 2005, who replied that the language was "simply the wording
of the language that was chosen" and that "[i]f you are
successful with meeting the conditions, your dismissal will be
revisited and you will be reinstated."  The plaintiff then signed

_____

[4]     In his opposition to the motion to dismiss, the
plaintiff states that Jefferson's decision to deny his appeal was
made at a meeting of the Committee on Student Promotion on July
12, 2005.  This fact is not alleged in the plaintiff's complaint.
The plaintiff, however, has attached to his complaint an email
exchange between him and Dr. Lopez on July 13, 2005, which
discusses the three conditions later memorialized in Dr. Lopez's
letter of July 20, 2005.  In the exchange, Dr. Lopez writes,
"Keep in mind until the three conditions are met, your status
remains that you are academically dismissed."  Compl. Ex. Z.

the letter of July 21, 2005, and returned it to Jefferson.  Datto I Compl. at ¶¶ 98-101, Ex. J, K.

The plaintiff changed healthcare providers after his dismissal.  These doctors determined that the medication he had been prescribed was causing his cognitive impairments.

After the plaintiff stopped taking his medication, he experienced "withdraw/rebound" effects that caused him to become highly emotional and manic and to suffer hallucinations.  These effects subsided over time.  During this time, the plaintiff suffered economic hardship.  Datto I Compl. at ¶¶ 103, 108-113.

The plaintiff alleges that, as part of his doctors' attempt to diagnose his condition, they asked to review emails from the plaintiff's Jefferson email account, which Jefferson would not allow.  On June 29, 2006, the plaintiff sent an email to fifteen Jefferson employees complaining of being denied access to his emails and threatening to file complaints about Jefferson's actions with the governor's office, the attorney general, and the departments of education and justice.  Datto I Compl. at ¶¶ 104-05, Ex. M.

The plaintiff sent another email on September 4, 2006, to the program directors and chairmen of Jefferson, the University of Pittsburgh Medical Center and Northwestern Medical Center, copying three malpractice attorneys and officials of the NIH and Office of the Inspector General, among others.  The email stated that he had personal knowledge that certain unnamed

-17-

residents, fellows, and recent graduates of the three
institutions were "long standing" drug users and/or had been at a
party where drugs were used.  The email stated that the plaintiff
believed drug use was a wide-spread problem at these institutions
and that he was requesting that they conduct "a mandatory drug
screen this week of all your faculty to verify the veracity" of
his claims.  Datto I Compl. at ¶¶ 104, Ex. N.

      In October 2006, Jefferson "attempted to revoke the
promised accommodation" of reinstating him once he had been
medically and psychiatrically cleared.  The plaintiff states that
he has been cleared to return to Jefferson and has attached to
his complaint several letters and reports from physicians stating
that he can return to school.  He states that Jefferson refuses
to "engage in any interactive process" with him and continues to
deny him the opportunity to complete his studies.  He also states
that he has been unable to enter any other medical program in the
United States or Canada.  Datto I Compl. at ¶¶ 107, 114-117, Ex.
P-U.


      B.   The Allegations of the Datto III Complaint

      The complaint in Datto III is far more skeletal than
that in Datto I.  In their entirety, the allegations of the Datto
III complaint are:

      The plaintiff was a Jefferson M.D./Ph.D. student.
While he was at Jefferson, a Jefferson student suffering from

bipolar disorder killed another student.  The plaintiff alleges that the defendants perceive him as suffering from bipolar disorder.  The plaintiff also alleges that he suffers from a learning disability, for which the plaintiff requested accommodations from Jefferson.  Datto III Compl. at ¶¶ 13-17.

The defendants approved the plaintiff's request for accommodations and said he would be given the opportunity to finish his medical studies at Jefferson once he was physically and mentally cleared to do so.  When the defendants did "not appropriately engag[e] with him in an interactive process about this accommodation," the plaintiff threatened to file a complaint.  After this threat, the defendants attempted to rescind their previously approved accommodation of allowing him to finish his degree once medically cleared.  The plaintiff alleges that the defendants feared him because of his perceived bipolar disorder.  Datto III Compl. at ¶¶ 18-21.

The plaintiff is now free of psychiatric medication and his previous cognitive problems have resolved.  He has obtained clearance from a number of physicians that he is psychiatrically stable and there is no reason he cannot return to school.  The defendants are refusing to engage with him and allow him to return, and no other medical program in the United States or Canada has accepted him.  Datto III Compl. at ¶¶ 22-25.

III. <u>Analysis</u>

        The defendants in Datto I and Datto III have moved in
both cases to dismiss the plaintiff's claims under the ADA, the
Rehabilitation Act, the PHRA, and the PFEOA.  The defendants have
also moved to dismiss the plaintiff's wrongful termination claims
in Datto I.  If granted in their entirety the motions would
dismiss all claims in Datto III, but leave claims in Datto I for
breach of contract, intentional infliction of emotional distress,
intentional interference with contract, and federal claims under
the Fourteenth Amendment.


        A.   <u>The ADA and Rehabilitation Act Claims</u>

        The defendants in both Datto I and Datto III seek to
dismiss the plaintiff's ADA and Rehabilitation Act claims.  In
both Datto I and Datto III, the plaintiff brings ADA claims under
Title II (discrimination by a public entity ), Title III (public
accommodation discrimination), and Title IV (retaliation), 42
U.S.C. § 12131 et seq., § 12181 et seq., and § 12203.  The
plaintiff brings Rehabilitation Act claims under section 505,
codified at 29 U.S.C. § 794, which forbids disability
discrimination in any program receiving federal assistance, and
34 C.F.R. § 100.7(e), which forbids retaliation for exercising
rights under the Act.  The plaintiff brings his retaliation
claims under the ADA and the Rehabilitation Act against all

defendants.  He brings his other ADA and Rehabilitation Act claims only against Jefferson and Jefferson Hospital.

Because the defendants raise separate arguments in Datto I and Datto III for dismissal of these claims, the Court will address each case separately.


1.   Datto I

The defendants contend that the plaintiff's ADA and Rehabilitation Act claims in Datto I are time-barred.  In the alternative they argue that the plaintiff's retaliation claims against the individual defendants must be dismissed because neither statute provides for such liability.


a.   Statute of Limitations

Although the statute of limitations is an affirmative defense, it may be raised in a motion to dismiss where the plaintiff's failure to comply with the limitations period is apparent from the face of the pleadings.  In evaluating the statute of limitations on a motion to dismiss, a court is limited to the allegations of the complaint, the exhibits attached to the complaint, and matters of public record.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.1, n.2 (3d Cir. 1994).  A court must accept the factual allegations of the complaint as true, but need not accept as true legal conclusions

couched as factual allegations.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct.
1937, 1950 (U.S. 2009).

The statute of limitations for the plaintiff's ADA and
Rehabilitation Act claims is two years.  Because neither the ADA
nor the Rehabilitation Act contains an express limitation period,
their statute of limitations is determined by looking to the
limitations period for the most analogous cause of action in the
state in which it sits.  For the plaintiff's claims under the ADA
and the Rehabilitation Act, this is Pennsylvania's two-year
limitations period for personal injury actions.  <u>Disabled in
Action of Pa. v. S.E. Pa. Trans. Auth.</u>, 539 F.3d 199, 208 (3d
Cir. 2008) (upholding application of Pennsylvania's personal
injury limitations period to claims under ADA Title II and § 505
of the Rehabilitation Act); <u>Soignier v. Am. Bd. of Plastic
Surgery</u>, 92 F.3d 547, 551 (7th Cir. 1996) (upholding application
of state law personal injury statute of limitations to claim
under ADA Title III).

The plaintiff began Datto I by filing a praecipe in
state court asking for the issuance of a writ of summons on July
11, 2007.[5]  Under Pennsylvania procedure, the filing of such a

---

[5]     In some portions of the defendants' brief in support of
its motion to dismiss Datto I, the defendants state that the
plaintiff filed the praecipe in Datto I on July 11, 2007; in
other portions of the brief, the defendants give the date as June
11, 2007.  A review of the state court docket shows the praecipe
was filed July 11, 2007.

praecipe is sufficient to commence a lawsuit for purposes of tolling the statute of limitations.[6]  Pa. R. Civ. P. 1007.

Datto I having been filed on July 11, 2007, the plaintiff's ADA and Rehabilitation Act claims will be time-barred if they accrued before July 11, 2005.  The defendants contend that the plaintiff's claims accrued when Jefferson notified him that he was dismissed, in a letter dated May 31, 2005.  The plaintiff contends that his claims accrued, at the earliest, when he learned that his appeal of the dismissal was denied, which the plaintiff states that he knew on July 12, 2005, but which the documents attached to his complaint indicate occurred on July 13 or July 20, 2005.[7]  The plaintiff also contends that his claims

---

[6]     Under Pennsylvania law, although an action can be begun by filing a praecipe for a writ of summons, doing so will only toll the statute of limitations if the plaintiff makes a "good-faith effort to effectuate notice" that the suit has begun. McCreesh v. City of Phila., 888 A.2d 664, 666-67 (Pa. 2005). Lack of good faith, however, can only be found where "plaintiffs have demonstrated an intent to stall the judicial machinery or where plaintiffs' failure to comply with the Rules of Civil Procedure has prejudiced defendant." Id. at 674.  To make such a finding, evidentiary determinations are usually required. See Farinacci v. Beaver Cty. Indus. Dev. Auth., 511 A.2d 757, 759 (Pa. 1986).  The defendants have not alleged such a lack of good faith by the plaintiff and concede in their motions that the plaintiff's filing of the praecipes for writs of summons tolled the statute of limitations in both cases.

[7]     In the brief in opposition to the motion to dismiss, the plaintiff states that he learned that his appeal had been denied on July 12, 2005.  Although this date is not alleged in his complaint, a July 13, 2005, email exchange between the plaintiff and Dr. Lopez, attached to the complaint as Exhibit Z, indicates the plaintiff knew his appeal had been denied on that date.  Jefferson formally notified the plaintiff that his appeal had been denied in two letters dated July 20 and July 21, 2005.

-23-

arising from Jefferson's failure to reinstate him accrued no
earlier than October 2006, when Jefferson refused to allow him to
return after he met its conditions for reinstatement.  He
alternatively argues that, because Jefferson still refuses to
allow him to return, his claim continues to accrue under a
continuing violation theory.

Both the United States Supreme Court and the United
States Court of Appeals for the Third Circuit have addressed when
claims arising out of a termination or dismissal accrue in the
context of employment discrimination claims under statutes other
than the ADA and the Rehabilitation Act.  These decisions have
held that, in the employment context, a claim of unlawful
discrimination accrues when an employer "establishes its official
position and communicates that position by giving notice to the
affected employee."  Bailey v. United Airlines, 279 F.3d 194 (3d
Cir. 2002) (citing Del. State College v. Ricks, 449 U.S. 250, 257
(1980)).  A employer establishes an "official position" when it
"unconditionally" makes an adverse employment decision and
communicates that decision to the plaintiff.  Id.; see also
Watson v. Eastman Kodak Co., 235 F.3d 851, 855-56 (3d Cir. 2000);
Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1419 (3d Cir.

_____

Because all of these dates are after the day upon which the
plaintiff's claims in Datto I must have accrued to be timely, the
Court need not decide exactly when the plaintiff learned of the
denial.

1991) (ADEA claim accrued when the employer reached a "definitive conclusion" to terminate the plaintiff).

In <u>Ricks</u>, the United States Supreme Court considered a claim brought by a university professor who was denied tenure and ultimately dismissed.  Because the facts of <u>Ricks</u> have some parallels to those here, the Court will discuss the case in some detail.

In February 1973, a university faculty committee informed the <u>Ricks</u> plaintiff that it would not be recommending him for tenure, but that it would reconsider its decision in a year.  In February 1974, the faculty committee again decided not to recommend the plaintiff for tenure.  In March 1974, the full faculty senate adopted the committee's recommendation and, later that month, the board of directors of the university formally denied the plaintiff tenure.  The plaintiff then filed a grievance seeking reconsideration of the decision.  <u>Id.</u>, 449 U.S. at 252.

The university's policy was to terminate any faculty member considered and rejected for tenure, but to delay the termination by offering the faculty member a one-year "terminal" contract, after which he or she would leave the university.  The <u>Ricks</u> plaintiff was offered and accepted such a contract in June 1974.  In September 1974, the plaintiff's grievance was denied and, in June 1975, at the end of his one-year contract, the plaintiff was discharged.  <u>Id.</u>, 449 U.S. at 252-54.

-25-

The Ricks plaintiff filed a complaint with the Equal
Employment Opportunity Commission ("EEOC") in April 1975 and, in
September 1977, after receiving his right-to-sue letter, filed
suit under Title VII and 42 U.S.C. § 1981.  The defendants moved
to dismiss on the ground that the plaintiff's claims were time-
barred because he had not filed his EEOC complaint within 180
days of the relevant allegedly unlawful employment action, as
required for his Title VII claim, or filed his lawsuit within
three years of the defendants' discriminatory actions, as
required for his § 1981 claim.  The district court granted the
motion to dismiss, finding that the plaintiff's claim accrued
upon the denial of tenure.  The court of appeals reversed,
finding that the claim accrued only upon the plaintiff's ultimate
termination.  On appeal, the Supreme Court reversed and upheld
the district court's dismissal.  Id., 449 U.S. at 254-256.

The Supreme Court held that, to determine when the
plaintiff's claim accrued, a court was required to first identify
the precise unlawful employment practice challenged by the
plaintiff.  The Court found that, although the plaintiff had
attempted on appeal to characterize his claim as challenging both
his denial of tenure and his termination as motivated by unlawful
discrimination, this was contradicted by the allegations of his
complaint.  The plaintiff's complaint failed to allege any
discriminatory acts occurring up to the time of his termination
or that the manner of his termination differed from those of

-26-

other faculty members who had been denied tenure.  Because the
only alleged discrimination in the case concerned the denial of
tenure, the Court found that the plaintiff's discrimination claim
accrued when that decision "was made and communicated" to the
plaintiff.  Id., 449 U.S. at 259.  The plaintiff's subsequent
termination was only an "effect" or "consequence" of the
defendant's alleged discriminatory denial of tenure but not a
discriminatory act itself.  Id. at 259.

          Having found that the plaintiff's claim accrued when
the decision to deny him tenure was "made and communicated" to
him, the Court next considered the effect of the plaintiff's
grievance appealing the university's tenure decision.  The Court
found that the statute of limitations began to run when the
plaintiff was notified in a letter sent in June 1974 of the
university's official decision to deny him tenure.  Although the
plaintiff's grievance was pending at this time and was not
decided until September 1974, the Court held that this did not
affect the limitations period.  The Court found that the
university's "willingness to change its prior decision if Ricks'
grievance were found to be meritorious" did not render its tenure
decision tentative, as it merely provided a remedy to an decision
already made.  Id., 449 U.S. at 261.  Because the June 1974
accrual date meant that the plaintiffs' claims had been filed
outside the statute of limitations, the Court remanded the case

-27-

with instructions to reinstate the district court's dismissal. Id. at 262.

In this case, as instructed by Ricks, the court must begin an analysis of the statute of limitations by identifying the unlawful actions challenged by the plaintiff.  The allegations of the operative complaint challenge two distinct decisions by the defendants:  the decision to dismiss the plaintiff from Jefferson's M.D./Ph.D. program, first communicated to him in a letter of May 31, 2005, and subsequently upheld on appeal and communicated to him July 20 and 21, 2005, and the decision not to reinstate him to the program, which the plaintiff alleges took place in October 2006.

The plaintiff's claims concerning the first decision accrued on May 31, 2005, when the plaintiff was notified by letter that Jefferson had dismissed him.  The letter told the plaintiff that the Jefferson Committee on Student Promotion "has decided that your status at Jefferson Medical College has been officially dismissed."  This language is not equivocal.  It describes a completed decision to dismiss the plaintiff and describes his current status as "officially dismissed."  With the letter, Jefferson "made and communicated" the decision and started the statute of limitations running on all the plaintiff's claims concerning it.  See Ricks, 449 U.S. at 259; Bailey, 279 F.3d at 199.

-28-

The plaintiff's appeal of this decision and the possibility that it could have been reversed do not change when the cause of action accrued or otherwise toll the statute of limitations.  Like the grievance in <u>Ricks</u>, this was an opportunity for the plaintiff to have the defendants reconsider a decision that had already been made.  As such, the plaintiff's cause of action arose when the initial decision was communicated to him, not upon the conclusion of his appeal.

Having found that the plaintiff's claims concerning Jefferson's decision to dismiss him from the M.D./Ph.D. program accrued on May 31, 2005, the Court will dismiss the plaintiff's ADA and Rehabilitation Act claims in Datto I concerning that decision.  To be timely, the plaintiff would have had to file those claims by May 31, 2007, and Datto I was not begun until July 11, 2007.  As discussed below, the Court finds that these claims cannot be considered part of a continuing violation that might toll the statute of limitations.

The second decision challenged by the plaintiff is Jefferson's refusal to reinstate him.  The July 20, 2005, letter to the plaintiff from Assistant Dean Lopez informed the plaintiff that his appeal had been denied but set out three conditions that, if met, would allow the plaintiff to be reinstated.  The plaintiff alleges that he satisfied these conditions, but that, in October 2006, the university "attempted to revoke" its promise to reinstate him.  Although the complaint gives few details

-29-

concerning this October 2006 decision, it is clear that the
plaintiff is alleging that the decision not to reinstate him was
both motivated by discriminatory or retaliatory animus and
constituted a failure to accommodate his disability in violation
of the ADA and Rehabilitation Acts.  See Datto I Compl ¶¶ 191,
197, 203, 217, 222.

          In his brief, the plaintiff seeks to characterize the
October 2006 failure to reinstate him as a "continuing violation"
and part of a pattern and practice that includes his initial
dismissal.  When a defendant's conduct is part of a continuing
practice, the statute of limitations is extended so that an
action will be timely as long as the last act evidencing the
continuing practice falls within the limitations period.  Brenner
v. Local 514, United Bd. of Carpenters & Joiners, 927 F.2d 1283,
1295 (3d Cir. 1991).  In this case, if the plaintiff's claims
concerning the failure to reinstate him were filed within the
statute of limitations and were part of a continuing practice
with his dismissal, then the plaintiff's otherwise time-barred
claims concerning the dismissal would be timely.

          A continuing violation theory, however, is restricted
to situations like those alleging a hostile work environment,
involving repeated actions that may not be actionable on their
own.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115
(2002).  The theory does not apply to "[d]iscrete acts such as
termination, failure to promote, denial of transfer, or refusal

-30-

to hire" in which "[e]ach discrete discriminatory act starts a
new clock for filing charges alleging that act."  Id. at 114.[8]
Here, Jefferson's May 2005 decision to dismiss the plaintiff and
its October 2006 decision not to reinstate him are separate and
discrete acts, and each therefore has its own statute of
limitations clock.

        In Datto I, the plaintiff's ADA and Rehabilitation Act
claims concerning the decision not to reinstate him are timely.
The two-year statute of limitations on the October 2006 decision
expired October 2008, and Datto I was filed over a year earlier
on July 11, 2007.

                (1)  Individual Liability Under the ADA

        Whether the ADA imposes liability upon individuals for
claims of retaliation is an issue that has divided the federal
courts.  Some courts have held that individual liability is not
available for retaliation claims under the ADA because the ADA's
terms should be interpreted in light of Title VII's prohibition

_____

        [8]    Morgan involved a case brought under Title VII.  The
United States Court of Appeals for the Third Circuit has applied
Morgan to cases brought under the ADA in at least three
unpublished, non-precedential decisions.  Zankel v. Temple Univ.,
245 Fed. Appx. 196, 198-99 (3d Cir. 2007); Zdziech v.
DaimlerChrysler Corp., 114 Fed. Appx. 469, 471 (3d Cir. 2004);
Shenkan v. Potter, 71 Fed. Appx. 893, 895 (3d Cir. 2003).  It has
also described Morgan's distinction between discrete acts and
continuing violations as a "generic feature of federal employment
law" in O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir.
2006) (applying Morgan in a § 1983 case).

                                -31-

on individual liability.  Other courts, looking more closely at the statutory language, have held that the ADA imposes individual liability for retaliation claims that do not involve employment. The Court will begin its analysis with a general overview of the ADA and its provisions.

a)   <u>Statutory Structure and Text</u>

The ADA contains four sub-parts.  The first three sections of the statute, Titles I, II, and III, bar discrimination on the basis of disability in different areas of public life.

ADA Title I addresses discrimination in employment and bars disability discrimination by an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12111(2), 12112.  Title I contains its own enforcement provision, § 12117, which incorporates the remedies of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-4 to -9.

ADA Title II, in pertinent part, bars disability discrimination in the services, programs, or activities of a "public entity," defined as a state or local government, its agencies or instrumentalities, and the National Railroad Passenger Corporation or any commuter authority.  <u>Id.</u> §§ 12131(1), 12132.[9]  Title II contains an enforcement provision,

_____

[9]   Title II is itself divided into two parts, Part A and Part B.  Part A, §§ 12131-12134, concerns discrimination by

§ 12133, which incorporates the remedies of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), which, in turn, incorporates Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d, et seq.

ADA Title III addresses disability discrimination in public accommodations, defined to include places of education including post-graduate private schools, and bars disability discrimination by "any person who owns, leases (or leases to), or operates a place of public accommodation." §§ 12181(7)(J), 12182. The enforcement provision of Title III, § 12188, incorporates the remedies of Title II of the Civil Rights Act, 42 U.S.C. § 2000a-3.

The final sub-part of the ADA, Title IV, contains miscellaneous provisions. One of these provisions, § 12203, forbids retaliation against anyone for opposing actions made unlawful under the ADA or for participating in a charge under the ADA. § 12203(a). It also forbids coercion or intimidation against anyone exercising his or her rights under the statute. § 12203(b). The relevant language concerning retaliation is broadly worded:

> No person shall discriminate against any
> individual because such individual has
> opposed any act or practice made unlawful by
> this chapter or because such individual made
> a charge, testified, assisted, or
> participated in any manner in an

_____

public entities and is the subsection at issue in this case. Part B, §§ 12141-12165, applies to public transportation.

investigation, proceeding, or hearing under
this chapter.

§ 12203(a) (emphasis added).

Section 12203 contains its own enforcement provision
which provides that anyone subject to retaliation or coercion in
violation of the section shall have "[t]he remedies and
procedures available" under the specific enforcement provisions
of Titles I, II, and III, with respect to retaliation concerning
those respective provisions.  § 12203(c).  Under this language, a
plaintiff bringing a retaliation claim will have different
remedies depending on the particular rights under the ADA at
issue.  For example, a plaintiff bringing an ADA retaliation
claim involving employment will have the remedies of Title I of
the ADA, which incorporates the remedies of Title VII, but a
plaintiff bringing a retaliation claim involving public
accommodations will have the remedies of Title III of the ADA,
incorporating the remedies of Title II of the Civil Rights Act.

b)   <u>Prior Decisions</u>

The United States Court of Appeals for the Third
Circuit has not yet addressed whether individual liability exists
for retaliation claims under the ADA, but it has addressed the
existence of such liability for discrimination claims under the
ADA's other three titles.  It has stated in dicta that individual
liability is not available for discrimination claims brought

-34-

under Title I or Title II of the ADA.  Koslow v. Commw. of Pa., 302 F.3d 161, 178 (3d Cir. 2002) ("there appears to be no individual liability for damages under Title I of the ADA"); Emerson v. Theil College, 296 F.3d 184, 189 (3d Cir. 2002) (suggesting in dicta that "individuals are not liable under Titles I and II of the ADA") (citing Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 107 (2d Cir. 2001) (holding Title II does not allow suits against individuals).  It has also held that individual liability is available under Title III of the ADA, but only if an individual owns, leases, or operates a place of public accommodation.  Emerson, 296 F.3d at 189.[10]

Courts that have addressed individual liability for retaliation claims under the ADA have reached different conclusions depending on what rights under the ADA are involved in the claim.  In cases involving retaliation for the exercise of rights under Title I, involving employment, courts have uniformly found that individual liability is not available.  In cases involving retaliation for exercising rights under Title II,

---

[10]   Although the Emerson court found individual liability could be imposed under Title III on owners, lessors, or operators of public accommodations, it interpreted the scope of this liability narrowly.  The court held that to "operate" a public accommodation within the meaning of the statute, one must control or direct its functioning or conduct its affairs.  In applying this definition, the court found, without explanation, that the president, deans, and faculty members of a college could not be considered to "operate" it within the meaning of Title III and so were not subject to individual liability.  Emerson, 296 F.3d at 189.

involving discrimination by public entities, courts have divided as to the existence of individual liability.  Cases involving retaliation for exercise of Title III rights, involving public accommodations, have been few and less clearly reasoned, but have denied individual liability.

Here, the plaintiff brings retaliation claims for the exercise of his rights under ADA Title II and Title III. Although the plaintiff has not alleged retaliation involving Title I, the Court will nonetheless start by discussing decisions involving such claims because their reasoning forms the basis for subsequent decisions concerning Title II and Title III.

i)   Title I

Courts considering retaliation claims involving the exercise of Title I rights forbidding employment discrimination have found that individual liability may not be imposed for such claims.  See, e.g., Albra v. Advan, Inc., 490 F.3d 826, 830-34 (11th Cir. 2007); Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999); Stern v. Cal. State Archives, 982 F. Supp. 690, 692-93 (E.D. Cal. 1997); McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp.2d 393 (E.D. Pa. 2002).

These decisions rely on the similarity between Title VII, the Age Discrimination in Employment Act ("ADEA"), and Title I of the ADA, which all involve discrimination in employment. All three statutes impose liability on employers and define an

-36-

"employer" similarly as "a person" engaged in industry or commerce who has either fifteen or twenty or more employees. Compare 42 U.S.C. § 12111(5)(A) with id. § 2000e(b) and 29 U.S.C. § 630(b).  Because of this similarity in language and purpose, courts have routinely held that decisions interpreting one statute should guide the interpretation of the other.  See, e.g., Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995) (noting that "the ADA, ADEA, and Title VII all serve the same purpose -- to prohibit discrimination in employment against members of certain classes[, and] . . . the methods and manner of proof under one statute should inform the standards under the others as well."); E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1280 (7th Cir. 1995) ("Courts routinely apply arguments regarding individual liability to all three statutes interchangeably.").

        Title VII has long been interpreted not to impose liability on individuals.  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077 (3d Cir. 1996).  This conclusion is based, in part, on the structure of the statute, which sets out a sliding scale for damages based on an employer's number of employees that makes no reference to the amount of damages payable by an individual.  Id. 1077-78.  Based on the same reasoning, Title I of the ADA has also been interpreted to not impose individual liability.  See Koslow v. Commw. of Pa., 302 F.3d 161, 178 (3d Cir. 2002) (stating that there "appears to be

no individual liability for damages under Title I of the ADA and citing AIC Sec. Investigations, 55 F.3d at 1280 (holding that Title I did not impose individual liability for damages and citing cases so holding under Title VII and the ADEA)).

Courts addressing whether individual liability may be imposed under the ADA for retaliation claims involving employment have often not distinguished between discrimination claims under Title I of the ADA and retaliation claims under Title IV, § 12203.  Such cases have held, without separate analysis, that individual liability is not available under either type of claim. See, e.g., Butler, 172 F.3d at 744; McInerney, 244 F. Supp.2d at 397-98.  These decisions do not address the distinct language of § 12203(a) prohibiting retaliation by "persons."

Several courts have addressed the statutory text of § 12203 and have reached the same conclusion that individual liability is not available for retaliation claims.  Albra, 490 F.3d at 830-34; Stern, 982 F. Supp. at 692-94.  These decisions reason that the reach of the broad language of § 12203(a), referring to retaliation by "persons," is narrowed by the enforcement provisions of § 12203(c), which with respect to claims involving employment incorporate the remedies of Title VII.  Because Title VII has been consistently held not to provide a remedy against individual defendants, these courts reason that, by incorporating Title VII remedies in claims involving employment, the retaliation provision of the ADA has been

-38-

similarly limited.  Albra, 490 F.3d at 832-33; Stern, 982 F.
Supp. at 694.


ii)   Title II

Title II of the ADA concerns discrimination by "public
entities."  As mentioned earlier, the United States Court of
Appeals for the Third Circuit has suggested, in accordance with
other courts that have considered the issue, that Title II does
not impose liability upon individuals, at least for damages.
Emerson, 296 F.3d at 189 (dicta) (citing Garcia, 280 F.3d at
107); see also Alsbrook v. City of Maumelle, 184 F.3d 999, 1005
n.8 (8th Cir. 1999) (no individual liability under Title II);
c.f. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (individuals
may be sued under Title II in their official capacity for
prospective injunctive relief under Ex Parte Young); McCarthy ex
rel. Travis v. Hawkins, 381 F.3d 407, 413-14 (5th Cir. 2004)
(same).

In considering retaliation claims under the ADA
involving public entities, courts have divided as to whether
individual liability exists.  At least one court has held that it
does not, assuming without explanation that Title VII's
prohibition on individual liability should apply to all
provisions of the ADA.  Baird ex rel. Baird v. Rose, 192 F.3d
462, 472 (4th Cir. 1999) ("because Congress has made the remedies
available in Title VII applicable to ADA actions, the ADA does

-39-

not permit an action against individual defendants for retaliation for conduct protected by the ADA"). Baird did not address the language of § 12203(a) forbidding retaliation by "persons" or consider that the relevant enforcement provisions of § 12203(c) for claims involving a public entity incorporate the remedies of Title VI, not Title VII.

Other courts have more directly grappled with the statutory language. The leading case to do so is Shotz v. City of Plantation, 344 F.3d 1161 (11th Cir. 2003). Shotz began by recognizing that the language of § 12203(a), forbidding retaliation by "persons," imposed a duty on individuals "to refrain from such conduct." Id. at 1168. The court reasoned that the fact that the statute "imposes such a duty on a class of actors does not compel the further conclusion that individual members of that class are amenable to private suit or otherwise liable for a breach of that duty." Id. To determine whether individuals were liable for retaliation, the Shotz court turned to the applicable enforcement provision of the statute, incorporating the remedies of Title VI, 42 U.S.C. §§ 2000e-5(f)-(k).

Title VI provides that no person shall be excluded from participation or subjected to discrimination by any program or activity receiving federal funds. 42 U.S.C. §§ 2000d. Although the statute contains no private right of action, one has been implied that allows for both compensatory damages and injunctive

relief.  <u>Barnes v. Gorman</u>, 536 U.S. 181, 185-87 (2002).  Because
Title VI is an exercise of the Congress's Spending Power, courts
have interpreted Title VI to impose liability only upon those who
actually receive federal funds for the program or activity at
issue and have, therefore, held that individuals are ordinarily
not liable under the statute.  See <u>Shotz</u>, 344 F.3d at 1169-70;
<u>Shannon v. Lardizzone</u>, 2008 WL 2385790 (D. Del. June 11, 2008),
<u>aff'd</u>, 2009 WL 1705664 (3d Cir. June 18, 2009) (unpublished op.);
<u>Kelly v. Rice</u>, 375 F. Supp.2d 203, 209 (S.D.N.Y. 2005).

　　　　<u>Shotz</u> found that, because Title VI did not reach
individuals unless they could be held to be recipients of federal
funds, there was a conflict between the broad language of
§ 12203(a) imposing liability upon all "persons" and the
applicable enforcement provisions of § 12203(c) that incorporated
Title VI's remedies.  <u>Shotz</u> described the conflict as:

> Did Congress intend the rights-and
> duty-creating language in the ADA
> anti-retaliation provision to, itself,
> countenance liability against individuals for
> its violation, or did Congress intend the
> remedies available for Title VI violations to
> control exclusively the type of relief
> available as well as the appropriate scope of
> liability?

<u>Id.</u> at 1171.

　　　　<u>Shotz</u> expressed concern that if the remedies of Title
VI governed the scope of liability for retaliation involving
public services under the ADA, the result might deviate
considerably from the ADA's intent and purpose.  Unlike Title VI,

-41-

the ADA was not enacted under the spending power and was intended
to reach all "public entities," regardless of whether they
received federal funds.  Shotz also noted that limiting the ADA's
retaliation provision to only recipients of federal funds might
make it duplicative of the Rehabilitation Act, 29 U.S.C.A. § 794,
which similarly prohibits disability discrimination by entities
receiving federal funding.  Id. at 1174.

     After considering both the text and the legislative
history of the ADA, the Shotz court held that it was unable to
resolve the conflict and that the statute was ambiguous.  The
court, therefore, turned to agency interpretations.  Id. at 1177.

     Regulations construing the retaliation provision of the
ADA have been issued by the United States Department of Justice
("DOJ").[11]  In pertinent part, they state that "[n]o private or
public entity shall discriminate against any individual because
that individual has opposed any act or practice made unlawful by
this part. . . ."  28 C.F.R. §§ 35.134.  In issuing these
regulations, the DOJ provided a section-by-section analysis,

---

     [11]     The authority to issue regulations to implement the ADA
is apportioned by title.  See Sutton v. United Air Lines, Inc.,
527 U.S. 471, 478-79 (1999).  The EEOC has authority to issue
regulations pertaining to ADA Title I, §§ 12111-12117, pursuant
to § 12116.  The Attorney General, through the Department of
Justice, has authority to issue regulations with respect to Title
II, subtitle A, §§ 12131-12134, pursuant to § 12134 and with
respect to the non-transportation provisions of Title III,
pursuant to § 12186(b).  The Secretary of Transportation has
authority to issue regulations pertaining to the transportation
provisions of Titles II and III, pursuant to § 12149(a).

published as an appendix to the regulations, which explains their
scope.  With respect to the ADA's retaliation provision, it
states:

> Because this section prohibits any act of
> retaliation or coercion in response to an
> individual's effort to exercise rights
> established by the Act . . . the section
> applies not only to public entities subject
> to this part, but also to persons acting in
> an individual capacity or to private
> entities.  For example, it would be a
> violation of the Act and this part for a
> private individual to harass or intimidate an
> individual with a disability in an effort to
> prevent that individual from attending a
> concert in a State-owned park. It would,
> likewise, be a violation of the Act and this
> part for a private entity to take adverse
> action against an employee who appeared as a
> witness on behalf of an individual who sought
> to enforce the Act.

28 C.F.R. Part 35, App. A., "Nondiscrimination on the Basis of
Disability in State and Local Government Services," 56 Fed. Reg.
35,696, 35,707 (July 26, 1991).

Shotz found that these DOJ regulations were entitled to
Chevron deference as a permissible construction of an ambiguous
statute.   The court therefore held that individuals could be
liable for violating § 12203 of the ADA for retaliation involving
public services.  Id., 344 F.3d at 1179-80.

Several courts since the Shotz decision have adopted
its reasoning and similarly found that ADA retaliation claims
involving public services may be brought against individuals.
See Alston v. District of Columbia, 561 F. Supp.2d 29 (D.D.C.

2008); <u>Thomas v. Pa. Dep't of Corr.</u>, 2008 WL 68628 *5 (W.D. Pa. Jan. 04, 2008); <u>Zied-Campbell v. Richman</u>, 2007 WL 1031399 at *18 (M.D. Pa. March 30, 2007).

### iii) <u>Title III</u>

This Court has found only two decisions addressing individual liability for ADA retaliation claims under § 12203 involving disability discrimination in public accommodations, actionable under Title III of the ADA.  <u>Scott v. Greater Phila. Health Action, Inc.</u>, 2008 WL 4140407, *4 (E.D. Pa. Sep 05, 2008); <u>Douris v. Schweiker</u>, 229 F. Supp.2d 391, 396-97 (E.D. Pa. 2002). Both hold that individual liability is not available for such claims on the basis of a "consensus view in this judicial district" that there is "no individual liability under the ADA." <u>Scott</u> at *4; <u>Douris</u> at 397 (citations and internal quotations omitted).  The cases cited in support of this consensus, however, concern discrimination in the context of employment, not public accommodations.  <u>Douris</u> expressly relies on Title VII's prohibition on individual liability in support of its holding. Neither case addresses the specific language of § 12203.

-44-

¢)   <u>Analysis of Individual Liability</u>

The Court finds that individual liability may be imposed for retaliation claims under the ADA involving either public entities or public accommodations.

The Court begins with the clear statement of § 12203(a) that "no person" shall discriminate against any individual for opposing an act or practice made unlawful under the ADA or participating in a proceeding under the ADA.  This language imposes a duty on individuals and, standing alone, would support individual liability under the statute.

The Court must next consider whether the enforcement provisions of § 12203(c) narrow the scope of liability under the statute.  As discussed above, courts considering ADA retaliation claims in the context of employment have looked to Title VII's prohibition on individual liability and similarly limited claims under the ADA.  This is appropriate in employment cases because, under § 12203(c), retaliation claims in that context apply the remedies of Title I of the ADA, which incorporates the remedies of Title VII.  Title VII, however, is not relevant to retaliation claims involving public entities or public accommodations because, for such claims, § 12203(c) authorizes the remedies of different sections of the Civil Rights Act.

With respect to retaliation claims involving public entities, § 12203(c) incorporates remedial provisions of Title VI.  As discussed above, the <u>Shotz</u> decision found a conflict

between the broad language of § 12203(a), which seemingly
authorizes individual liability, and the restricted scope of
Title VI, which as an exercise of the congressional spending
power, reaches only recipients of federal funds.  Shotz found
that this conflict rendered the statute ambiguous and deferred to
DOJ regulations which had interpreted the statute to allow
individual liability.

        The Court is not convinced that there is necessarily a
conflict between § 12203(a) and the incorporated provisions of
Title VI.  Courts have limited the scope of liability under Title
VI to only entities actually receiving federal funds because the
statute is based on the spending power.  See Shotz, 344 F.3d at
1169-70; Shannon, 2008 WL 2385790, aff'd, 2009 WL 1705664; Kelly,
375 F. Supp.2d at 209.  The authority for Title II of the ADA,
however, is not the spending power, but § 5 of the Fourteenth
Amendment.  Tennessee v. Lane, 541 U.S. 509, 533-34 (2004).  When
the provisions of Title VI are incorporated into the ADA, through
the enforcement provisions of § 12203 and Title II, they are no
longer authorized by the spending clause, but by the Fourteenth
Amendment, and therefore no longer need to be interpreted
narrowly.

        If the provisions of Title VI, as incorporated into the
ADA, are no longer interpreted as limited by the contours of the
spending power, then there is no irreconcilable conflict between
those provisions and the broad language of § 12203(a), and both

-46-

can be interpreted to allow for individual liability.  Such a result would harmonize both the liability and enforcement provisions of § 12203 and would accord with the interpretive regulations issued by the DOJ.  The Court therefore finds that individuals may be subject to liability under § 12203 for retaliation claims involving public entities.

With respect to retaliation claims involving public accommodations, the Court similarly finds that § 12203 imposes individual liability.  For such claims, § 12203(c) incorporates the remedies of Title III, which in turn incorporates provisions of Title II of the Civil Rights Act.  The applicable provisions of Title II authorize suits by private parties against "persons" for injunctive relief:

> Whenever any person has engaged or there are
> reasonable grounds to believe that any person
> is about to engage in any act or practice
> prohibited by section 2000a-2 of this title,
> a civil action for preventive relief,
> including an application for a permanent or
> temporary injunction, restraining order, or
> other order, may be instituted by the person
> aggrieved . . .

42 U.S.C. § 2000a-3(a).  There is, therefore, no conflict between the liability language of § 12203(a) and the remedial provisions of Title II:  both allow suits for injunctive relief against "persons."

2)   Individual Liability Under the
<u>Rehabilitation Act</u>

The plaintiff has brought claims in Datto I against
Jefferson for violating § 504 of the Rehabilitation Act, 29
U.S.C. § 794, and against all defendants for retaliating against
him for exercising his rights under the Act, citing 34 C.F.R. §
100.7(e).  The defendants move to dismiss the retaliation claims
under the Rehabilitation Act against the individual defendants.

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a
> disability in the United States . . . shall,
> solely by reason of her or his disability, be
> excluded from the participation in, be denied
> the benefits of, or be subjected to
> discrimination under any program or activity
> receiving Federal financial assistance . . .

29 U.S.C. § 794(a).  A "program or activity" is defined to
include the operations of a college or university.  <u>Id.</u>
§ 794(b)(2)(A).  Section 504 gives rise to an implied private
right of action to enforce its provisions, and Congress has
specifically provided that the remedies and procedures of Title
VI are available to those seeking to enforce it.  <u>Three Rivers
Ctr. for Independent Living v. Housing</u>, 382 F.3d 412, 425 (3d
Cir. 2004) (citing § 794a(a)(2)).

The United States Court of Appeals for the Third
Circuit has stated in general terms that individual liability may
not be imposed under the Rehabilitation Act.  <u>A.W. v. Jersey City
Public Schools</u>, 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be

-48-

brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals."). Other courts to have considered the issue have also held that the Rehabilitation Act does not provide for individual liability. Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 107 (2d Cir. 2001); Taylor v. Altoona Area Sch. Dist., 513 F. Supp.2d 540, 557 (W.D. Pa. 2007) (collecting cases).

The plaintiff argues that the individual defendants here can be liable under the Rehabilitation Act because they might be the recipient of federal funds. The plaintiff relies on Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002). In Emerson, the United States Court of Appeals for the Third Circuit considered a claim similar to that here, brought by a pro se plaintiff against a college and individual members of its faculty and administrative staff, alleging, in part, that the defendants violated the Rehabilitation Act by dismissing the plaintiff for academic reasons without making accommodations for his disabilities. The Emerson court upheld the dismissal of the plaintiff's Rehabilitation Act claims against the individual defendants on the ground that the college was the only recipient of federal funds, holding that "[b]ecause the individual defendants do not receive federal aid, [the plaintiff] does not state a claim against them under the Rehabilitation Act." Id., 296 F.3d at 190.

-49-

The plaintiff argues that the individual defendants here, who are all medical faculty and administrators, likely received federal funds, either through federal research grants or federal student loans for their medical education. Even if this were so (and the plaintiff does not allege it in his complaint), it would not be sufficient to state a claim against these defendants under the Rehabilitation Act. Unlike the ADA, the Rehabilitation Act is an exercise of Congress' constitutional spending power, conditioning the receipt of federal money on the recipient abiding by specified conditions. As such, the conduct for which liability may be imposed under the Act is informed by contract law principles. Barnes v. Gorman, 536 U.S. 181, 186-87 (2002).

In this case, the "program or activity receiving Federal financial assistance," from which the plaintiff contends he was excluded is Jefferson's M.D./Ph.D. program. The party receiving federal funds for that program, and thereby accepting the contract-like obligations of the Rehabilitation Act, is Jefferson. The plaintiff does not allege, nor could he reasonably have alleged, that any of the individual defendants received federal money for that program. To the extent that any of the individual defendants may be receiving or have received federal funds for research grants or federal loans for medical education, the receipt of those funds is unrelated to the alleged

discrimination or retaliation against the plaintiff and cannot support liability under the Rehabilitation Act.

The plaintiff's claims under the Rehabilitation Act against the individual defendants in Datto I will therefore be dismissed.


2.   <u>Datto III</u>

In the motion to dismiss in Datto III, the defendants contend that the plaintiff's ADA and Rehabilitation Act are time-barred; that they fail to state a claim under either statute; and that the retaliation claims against the individual defendants must be dismissed.


a.   <u>Statute of Limitations</u>

As discussed with respect to Datto I, the statute of limitations for the plaintiff's ADA and Rehabilitation Act claims is two years.  Datto III was begun by a praecipe for writ of summons filed on October 10, 2008.  The ADA and Rehabilitation Act claims in Datto III will therefore be untimely if they accrued before October 10, 2006, unless the limitations period was otherwise tolled.

The plaintiff's ADA and Rehabilitation Act claims in Datto I and Datto III are substantively identical.  Neither party has suggested that the two complaints concern different acts or seek different relief.  The only difference between the two

-51-

claims is that Datto I names eight individual defendants not named in Datto III and Datto III names one individual defendant and one institutional defendant not named in Datto I.

Despite being substantively identical, the factual allegations in Datto III are much less detailed than Datto I.  In particular, the complaint in Datto III, filed after the defendants had moved to dismiss Datto I, in part, on statute of limitations grounds, alleges no dates and attaches no documents stating when the events at issue took place.

The Court therefore must decide whether it can consider the dates alleged by the plaintiff in the Datto I complaint, the accuracy of which the plaintiff does not dispute, in determining whether the claims in Datto III are time-barred.  The two cases have been consolidated for all purposes, on the plaintiff's motion, and the complaint in Datto I is therefore a pleading in Datto III.  The Court also finds that the July 20, 2005, letter from Dr. Lopez, informing the plaintiff that his appeal of his dismissal has been denied and setting out the three conditions under which his dismissal will be reconsidered, is integral to the plaintiff's claims because it sets out the reasonable accommodations that the plaintiff contends the defendants agreed to and then rescinded.

Given this, the Court believes it can consider the July 20, 2005, letter in ruling on the plaintiffs' claims in Datto III.  U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d

Cir. 2002) ("[a]lthough a District Court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotation and citation omitted).  The Court also believes it can consider the plaintiff's allegation in Datto I that the defendants' refusal to reinstate him to the M.D./Ph.D. program occurred in October 2006.

As discussed above in reference to Datto I, the plaintiff's claims under the ADA and the Rehabilitation Act are time-barred to the extent they concern the defendants' decision to dismiss him from the M.D./Ph.D. program, referenced in the July 20, 2005, letter.  These claims were previously found untimely in Datto I, filed on July 11, 2007, and are even more untimely with respect to Datto III, filed over a year later on October 10, 2008.

The plaintiff's ADA and Rehabilitation Act claims are not time-barred to the extent they concern the defendants' alleged failure to reinstate him to the M.D./Ph.D. program.  The plaintiff alleges in Datto I that he was denied reinstatement in October 2006 and Datto III was filed two years later on October 10, 2008.  The Court therefore cannot say that the ADA and Rehabilitation Act claims in Datto III concerning the plaintiff's failure to be reinstated are time-barred.

b.   <u>Failure to State a Claim</u>

The defendants contend that the plaintiff has failed to adequately state a claim under the ADA or Rehabilitation Act in Datto III.  They did not make this argument with respect to the ADA or Rehabilitation Act claims in Datto I.

To the extent that the defendants are arguing that the claims in Datto III are too skeletal to state a claim, but that the more detailed claims in Datto I are sufficient, the Court will deny the motion.  Even if the bare-bones allegations in Datto III, considered in isolation, were insufficient to adequately state a claim, no purpose would be served in dismissing those claims only to have the plaintiff simply re-plead the allegations of Datto I.  Now that the two cases are consolidated, the purpose of giving the defendants adequate notice of the plaintiff's claims, required by Rule 8 of the Federal Rules of Civil Procedure, has been satisfied by the allegations in the more detailed complaint in Datto I.

It is not clear whether the defendants are arguing that the ADA and Rehabilitation Act claims in Datto III should be dismissed, even if the more detailed allegations in Datto I are considered.  To the extent the defendants are making this argument, the Court rejects it.

The defendants contend that the plaintiff has failed to adequately allege that he is a "qualified individual with a disability" as required to state a claim under ADA Titles II and

-54-

III or that he is an "individual with a disability" required to state a claim under the Rehabilitation Act.  42 U.S.C. §§ 12102, 12132, 12182; U.S.C. § 705(20)  The plaintiff has alleged that he was perceived as suffering from bi-polar disorder; that he suffered from cognitive problems and difficulty reading caused by the side-effects of medication for that disorder; and that he suffered from a learning disability.  Datto I Compl. ¶¶ 182-86; Datto III Compl. ¶¶ 15-16.  This is sufficient to allege he suffered from a disability.

The defendants also allege that the plaintiff did not adequately allege that he engaged in the protected conduct necessary for his retaliation claims under the ADA and Rehabilitation Act.  In the Datto III complaint, the plaintiff alleges that, after the defendants refused to "engage with him" concerning his reinstatement, he threatened to sue them.  Datto III Compl. at ¶ 19.  In Datto I, the plaintiff alleges that he raised violations of the ADA with the defendants prior to being dismissed.  Datto I Compl. at ¶ 92.  At this early stage of the litigation, these allegations are sufficient to state a claim for retaliation.  C.f. LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 232 n.9 (3d Cir. 2007) (holding, in a claim under Title VII, that "[p]rotected activity for purposes of a prima facie case of retaliation does not mean a formal action against the employer . . . [and] can take the form of informal protests of discriminatory employment practices, including making

-55-

complaints to management") (internal quotation and citation omitted).

The defendants also argue that the documentation of the plaintiff's learning disability attached to the Datto III complaint is dated after his dismissal and that, therefore, he could not have been dismissed because of that disability.  This argument turns on an issue of fact that is not appropriate for resolution on a motion to dismiss.

c.   <u>Individual Liability for Retaliation Claims</u>

The defendants contend that the plaintiff cannot maintain his retaliation claims in Datto III against the individual defendants under the ADA and the Rehabilitation Act. For the reasons set out above in discussing these claims in Datto I, the Court will deny the motion with respect to the plaintiff's retaliation claims under ADA, which seek to enforce rights under ADA Title II and III, but will grant it with respect to the plaintiff's claims under the Rehabilitation Act.

B.   <u>The PHRA and PFEOA Claims</u>

The plaintiff has brought claims under the PHRA and the PFEOA in both Datto I and Datto III.  In both actions, these claims are brought against all defendants.  The defendants in both cases seek to dismiss these claims on the same grounds. They argue that these claims are time-barred; that they fail to

-56-

state a claim; and that there is no individual liability under
the PFEOA.  Because the same arguments are raised in both cases,
the Court will discuss the claims in each case together.


            1.   The PHRA

         To bring a claim under the PHRA, a plaintiff must
exhaust his administrative remedies by filing a complaint with
the Pennsylvania Human Rights Commission ("PHRA").  The PHRA
complaint must be filed within 180 days of the alleged act of
discrimination, and this requirement is strictly construed.  43
P.S. § 959(h); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d
Cir. 1997).[12]

         The defendants contend that the plaintiff has failed to
file his PHRA complaint within this time.  The defendants ask the
Court to consider the plaintiff's PHRA complaint, which although
not attached to the complaint, was referenced in passing in both
complaints.  Datto I Compl. at ¶ 228; Datto III at ¶ 70.  This
complaint was filed December 17, 2007.

_____

         [12]   The plaintiff suggests that, because he dual-filed a
complaint both with the EEOC and with the PHRC, he may be
entitled to file his PHRA claim within 300 days of the alleged
act of discrimination.  This is not correct.  Filing a complaint
with a state anti-discrimination agency like the PHRC can extend
the time for filing a complaint with the EEOC to 300 days, but
will not extend the time to file a complaint with the PHRC.
Compare 42 U.S.C § 2000e-5(e)(1) with 43 P.S. § 959(h); see also
Woodson, 109 F.3d at 925.

                            -57-

In opposition to the defendants' argument that his PHRA claims are time-barred, the plaintiff has attached to his brief a complaint he alleges he filed with the EEOC on July 2, 2007. He has also attached a form opting to also dual-file his complaint with the PHRC, dated August 31, 2007.

Even taking the earliest date put forward by the plaintiff for the filing of his PHRA complaint, July 2, 2007, the complaint was filed well after 180 days from the acts of discrimination alleged here.     The latest act of discrimination alleged by the plaintiff is the defendants' alleged refusal to reinstate him to the M.D./Pd.D. program in October 2006, at least 244 days before the PHRA complaint was filed.

The plaintiffs' PHRA claims are therefore time-barred and will be dismissed. The Court will not address the defendants other arguments for dismissal of these claims.

2.     The PFEOA

The PFEOA makes it an unfair educational practice for an educational institution to expel, suspend, deny facilities, or otherwise discriminate against any student because of race, religion, color, ancestry, national origin, sex, handicap or disability or to penalize or discriminate against any individual for initiating, testifying, participating, or assisting in PFEOA proceedings. 24 P.S. § 5004(3),(4). The act provides that the

-58-

procedure for processing any complaint and the remedies available under it shall be in accordance with the procedures of the PHRA. Id. § 5007.  Like the PHRA, the PFEOA therefore requires a plaintiff to bring a complaint with the PHRC within 180 days of the unfair educational practice at issue.

As discussed above, the plaintiff did not file a complaint with the PHRC within the required time and his PFEOA claims will therefore be dismissed.  The Court will not address the other issues raised by the defendants with respect to the PFEOA.

C.   The Wrongful Termination Claim in Datto I.

The defendants seek to dismiss the state law wrongful termination claim brought in Datto I.  No wrongful termination claim was brought in Datto III.  The Court will grant the defendants' motion as to this claim.

Pennsylvania law recognizes a common law action for wrongful termination when an employee's dismissal implicates public policy concerns.  Rothrock v. Rothrock Motor Sales, Inc., 883 A.2d 511, 515 (Pa. 2005).  This cause of action is an exception to the general presumption of at-will employment that is applicable only in "very limited circumstances." Id.  It may not be used to circumvent statutory remedies.  See Clay v. Advanced Computer Applications, 559 A.2d 917, 919 (Pa. 1989) (wrongful discharge claim unavailable for discrimination

actionable under the PHRA); Holewinski v. Children's Hosp. of Pittsburgh, 649 A.2d 712, 715 (Pa. Super. Ct. 1994) (same with respect to retaliation actionable under state whistleblower statute).

By its very nature, as a limited exception to at-will employment, a wrongful termination claim is limited to claims by employees against employers.  The plaintiff has identified no case law, nor has the Court's own research discovered any, in which Pennsylvania wrongful termination claims were permitted by a student against an educational institution.

Pennsylvania law permits students who believe they have been unlawfully discriminated against or retaliated against or otherwise wrongfully dismissed to bring claims under the PHRA and the PFEOA and claims for breach of contract.  Given Pennsylvania's expressed reluctance to expand the tort of wrongful termination, the Court will not extend it to the educational setting.  The plaintiff's claim for wrongful termination will therefore be dismissed.


IV.  Conclusion

For the reasons set out above, the Court will dismiss the plaintiff's ADA and Rehabilitation Act claims in both Datto I (Counts VI through X) and Datto III (Count I through V) as time-barred to the extent they concern the defendants' decision to dismiss the plaintiff from the Jefferson M.D./Pd.D. program.  The

Court will not dismiss those claims to the extent they concern the defendants' alleged refusal to readmit the plaintiff to that program.

The Court will also dismiss the plaintiff's retaliation claims against the individual defendants under the Rehabilitation Act in both cases (Count X in Datto I and Count V in Datto III), but will not dismiss the retaliation claims against those defendants under the ADA (Count VI in Datto I and Count III in Datto III).

The Court will dismiss the plaintiff's PHRA and PFEOA claims in both cases as time-barred (Counts XI and XII in Datto I and Counts VI and VII in Datto III) and will dismiss the plaintiff's wrongful termination claim in Datto I (Count IV) for failure to state a claim.

The plaintiff's claims in Datto I for breach of contract (Counts I, II, and III) and intentional infliction of emotional distress and intentional interference with contract (Count V) were not challenged in these motions to dismiss and also remain pending.

An appropriate Order will be entered separately.